Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/29/2020 08:07 AM CDT

State of Nebraska, appellant and cross-appellee,
v. Paula Boyd, appellee and cross-appellant.

___ N.W.2d ___

Filed September 22, 2020.    No. A-19-753.

1. **Trial: Convictions: Evidence: Appeal and Error.** An appellate court
will sustain a conviction in a bench trial of a criminal case if the prop-
erly admitted evidence, viewed and construed most favorably to the
State, is sufficient to support that conviction. In making this determi-
nation, an appellate court does not resolve conflicts in the evidence,
pass on the credibility of witnesses, evaluate explanations, or reweigh
the evidence presented, which are within a fact finder's province for
disposition. Instead, the relevant question is whether, after viewing the
evidence in the light most favorable to the prosecution, any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.

2. **Sentences: Appeal and Error.** Whether an appellate court is reviewing
a sentence for its leniency or its excessiveness, a sentence imposed by
a district court that is within the statutorily prescribed limits will not
be disturbed on appeal unless there appears to be an abuse of the trial
court's discretion.

3. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal
conviction for a sufficiency of the evidence claim, whether the evidence
is direct, circumstantial, or a combination thereof, the standard is the
same: An appellate court does not resolve conflicts in the evidence, pass
on the credibility of witnesses, or reweigh the evidence; such matters
are for the finder of fact. The relevant question for an appellate court is
whether, after reviewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the essential ele-
ments of the crime beyond a reasonable doubt.

4. **Criminal Law: Statutes: Appeal and Error.** When analyzing the text
of a criminal statute, an appellate court follows settled principles of
statutory construction.

5. **Criminal Law: Statutes.** Penal statutes are considered in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served.

6. \_\_\_\_: \_\_\_\_. Effect must be given, if possible, to all parts of a penal statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided.

7. **Statutes.** In the absence of anything indicating otherwise, statutory language is to be given its plain and ordinary meaning.

8. \_\_\_\_. The legal principle of expressio unius est exclusio alterius (the expression of one thing is the exclusion of the others) recognizes the general principle of statutory construction that an expressed object of a statute's operation excludes the statute's operation on all other objects unmentioned by the statute.

9. **Contracts.** Contract actions are created to protect the interest in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific individuals named in the contract.

10. **Statutes: Words and Phrases.** The term "context" in the statutory phrase "unless the context otherwise requires" means the context within which a defined statutory term is used within the statute's substantive provisions.

11. **Statutes.** It is a general principle of statutory construction that to the extent there is a conflict between two statutes, the specific statute controls over the general statute.

12. **Sentences: Probation and Parole: Appeal and Error.** When the State appeals from a sentence, contending that it is excessively lenient, an appellate court reviews the record for an abuse of discretion, and a grant of probation will not be disturbed unless there has been an abuse of discretion by the sentencing court.

13. **Sentences: Appeal and Error.** Whether an appellate court is reviewing a sentence for its leniency or its excessiveness, a sentence imposed by a district court that is within the statutorily prescribed limits will not be disturbed on appeal unless there appears to be an abuse of the trial court's discretion.

14. **Judgments: Appeal and Error.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

15. **Sentences: Appeal and Error.** The trial court's sentencing determination and an appellate court's review of that determination for an abuse of discretion are not formulaic or simply a matter of doctrine.

16. **Sentences.** The sentencing court is not limited in its discretion to any mathematically applied set of factors.

17.  ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.
18.  ____. Evidence regarding a defendant's life, character, and previous conduct, as well as prior convictions, is highly relevant to the determination of a proper sentence.
19.  **Sentences: Appeal and Error.** It is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate.

Appeal from the District Court for Douglas County: W. Russell Bowie III, Judge. Affirmed.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman, and Donald W. Kleine, Douglas County Attorney, and Katie Benson for appellant.

Mallory N. Hughes, of Dornan, Troia, Howard, Breitkreutz & Conway, P.C., L.L.O., for appellee.

Moore, Chief Judge, and Riedmann and Welch, Judges.

Welch, Judge.

## I. INTRODUCTION

Paula Boyd was convicted of abuse of a vulnerable adult, a Class IIIA felony, and was sentenced to 6 months' probation and ordered to pay a $5,000 fine. The State has appealed, contending that the sentence imposed was excessively lenient. Boyd has cross-appealed, contending that the evidence was insufficient to support her conviction. For the reasons set forth here, we affirm Boyd's conviction and sentence.

## II. STATEMENT OF FACTS

Sometime in 2017, Boyd sold her east coast home and planned to move to the west coast. During her cross-country trip, she stopped in Omaha, Nebraska, in May to visit her sister and their 89-year-old mother, Dorothy Pistillo. During Boyd's nearly monthlong stay in Omaha, she resided with

her mother to help care for her in order to relieve her sister from those duties.

On June 15, 2017, Boyd called the 911 emergency dispatch service and firefighters and paramedics arrived at Pistillo's home shortly before 11:30 a.m. Boyd met responders at the front door. Boyd reported that her mother had been on the floor "for a few days," had not been eating, and would not get up. One of the first responders described "a pungent, bad odor" that smelled like "rotten fecal matter" coming from the residence. Another described the odor emanating from the home as smelling like "feces" and a "strong urine smell," and still another described the odor as smelling like "death." First responders found Pistillo lying on the floor of the living room with her body, from the shoulders down, covered with a blanket and her head resting on a pillow. Pistillo was covered in her own fecal matter and urine, and the carpet was stuck to her body.

After an Omaha firefighter and paramedic spoke with Pistillo, he decided that she needed further care and decided to transport her to the hospital despite Pistillo's statement that she did not want to go to the hospital. En route to the hospital, Pistillo received inravenous fluids and oxygen. During the ambulance transport to the hospital, one paramedic described Pistillo as "alert and oriented." However, another paramedic stated that although Pistillo was "very weak and fragile," Pistillo was able to answer some questions and "seemed to understand initially what was going on," but by the time that the ambulance reached the hospital, Pistillo "seemed a little more confused [and] not able to answer all questions."

At the hospital, Pistillo reported to medical personnel that "she [felt] terrible [and] ha[d] pain everywhere." Pistillo's injuries included open sores to her right buttocks area, as well as to her right back area, knee, foot, and toes. Boyd told doctors that she "ha[d] tried to get [her mother] to go to the doctor recently but [her mother] refus[ed]."

Hospital personnel contacted law enforcement to report concerns that Pistillo may have been abused or neglected. An Omaha police detective spoke with Pistillo in her hospital room and stated that Pistillo "appeared confused" and that Pistillo's answers "didn't make a lot of sense." She further testified that, based upon her physical observations of Pistillo, it appeared to the detective that Pistillo needed a caretaker and that Pistillo needed someone to assist her with feeding, bathing, and cleaning herself.

Later that afternoon, officers returned to Pistillo's residence to execute a search warrant. Later that day, other officers contacted Boyd. An Omaha police report stated that Boyd informed officers that she had moved into her mother's home about 4 weeks prior and that Boyd's sister had "normally watched over their mother until [Boyd] started living there." Boyd informed one of the officers that

> her mother had fallen on the living room floor in front of the fireplace about a week ago and has been laying there since. She said her mother has not eaten all week and has urinated/defecated on herself the time she has been on the floor. BOYD pointed out the spot on the floor where her mother was laying which she said she cleaned up the mess. [The reporting officer] noticed what appeared to be a spot on the carpet where someone had attempted to clean the carpet due to the swirl pattern on the carpet. [The reporting officer] asked BOYD why she did not call 911 for help or her mother['s] doctor and she said her mother told her not to. BOYD said she called 911 this morning for a medic to check her mother. [The reporting officer] called dispatch who advised [the reporting officer] they received a 911 call from [the] above address today at 11:20 from "Nick". [The reporting officer] did not speak to "Nick", Mother, or [Boyd's sister] who were not on call.

Boyd was charged with abuse of a vulnerable adult, a Class IIIA felony, and tampering with physical evidence, a Class

IV felony. A trial to the bench was held where the aforementioned evidence was presented. Following the bench trial, the district court found Boyd guilty of abuse of a vulnerable adult and found her not guilty of tampering with physical evidence. Following the preparation of a presentence investigation report, the district court stated that it had considered the factors set forth in *State v. Thurman*, 273 Neb. 518, 730 N.W.2d 805 (2007), and sentenced Boyd to 6 months' probation and ordered her to pay a $5,000 fine. The court noted at the sentencing hearing that he considered "the five days that [Boyd had] already served as sufficient."

## III. ASSIGNMENTS OF ERROR

The State contends that the district court abused its discretion in imposing an excessively lenient sentence. Boyd cross-appealed, contending that the evidence was insufficient to support the verdict.

## IV. STANDARD OF REVIEW

[1] An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). In making this determination, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *Id*. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

[2] Whether an appellate court is reviewing a sentence for its leniency or its excessiveness, a sentence imposed by a district court that is within the statutorily prescribed limits will not be disturbed on appeal unless there appears to be an abuse

of the trial court's discretion. *State v. Gibson*, 302 Neb. 833, 925 N.W.2d 678 (2019).

## V. ANALYSIS

### 1. Boyd's Appeal

We first address Boyd's assignment of error in connection with her cross-appeal. Boyd assigns and argues that there was insufficient evidence to support a finding that she knowingly and intentionally neglected a vulnerable adult in violation of Neb. Rev. Stat. § 28-386 (Reissue 2016). Specifically, as it relates to the elements of that offense, Boyd argues that there was insufficient evidence to find that (a) Pistillo was a "'**vulnerable adult**,'" (b) Boyd was a "'**caregiver**,'" and (c) Boyd committed an "'**act**'" which caused or permitted Pistillo to be neglected as required under § 28-386(1)(f). We will discuss these arguments independently.

### (a) Vulnerable Adult

Boyd was specifically charged with a violation of § 28-386(1)(f). That statute provides that "[a] person commits knowing and intentional abuse, neglect, or exploitation of a vulnerable adult or senior adult if he or she through a knowing and intentional act causes or permits a vulnerable adult or senior adult to be: . . . (f) [n]eglected[.]" § 28-386(1). The State's amended information alleged that, between June 10 and 15, 2017, Boyd did "knowingly and intentionally commit [an] act, which caused or permitted . . . PISTILLO, a vulnerable adult, to be neglected, in violation of Neb. Rev. Stat. §28-386[,] a Class IIIA Felony." Boyd first argues that there was insufficient evidence in the record to support a finding that Pistillo was a "vulnerable adult."

Neb. Rev. Stat. § 28-371 (Reissue 2016) defines "[v]ulnerable adult" as "any person eighteen years of age or older who has a substantial mental or functional impairment or for whom a guardian or conservator has been appointed under the Nebraska Probate Code." Because no guardian or conservator had been appointed for Pistillo, Boyd argues that the State

was required to show that Pistillo suffered from a "substantial mental or functional impairment" in order to qualify as a vulnerable adult and simply failed to do so at the time of trial. In support of this contention, Boyd argues:

> There was no evidence presented by any expert or lay witness that [Boyd's] mother was suffering from a substantial mental or functional impairment during the time [Boyd] was staying at her residence. On the contrary, the record is full of paramedic and medical opinions describing [Boyd's] mother as "answering questions appropriately", "no possible injury", "normal baseline for patient with respect to neurological state", "alert", "oriented", "well nourished", and capable of "declining a feeding tube."

Brief for appellee on cross-appeal at 9-10.

[3] Neb. Rev. Stat. § 28-368 (Reissue 2016) defines "[s]ubstantial functional impairment" as "a substantial incapability, because of physical limitations, of living independently or providing self-care as determined through observation, diagnosis, investigation, or evaluation." In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). The relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Here, Boyd herself acknowledged that her 89-year-old mother had been on the floor for days, would not get up, and had not eaten before Boyd requested medical assistance. When medical assistance arrived, the attendants documented that Pistillo's skin had adhered to the carpet and that she was wearing soiled adult "Depends" undergarments. The paramedics attending to Pistillo decided to transport her to the hospital

because she would not get up by herself and appeared unable to care for herself. Taken together, this testimony provided sufficient evidence of "observation[s]" that Pistillo was suffering from "a substantial incapability, because of physical limitations, of living independently or providing self-care." As such, the district court did not err in finding that Pistillo was a "vulnerable adult" as that term is defined by Nebraska statute. See § 28-368. That portion of Boyd's assignment of error fails.

(b) Boyd Was Not Caregiver

Boyd next argues that in order to find neglect, the fact finder must first determine that Boyd was Pistillo's caregiver and that there was insufficient evidence in the record to support that finding.

As we previously stated, the State specifically charged Boyd with knowingly and intentionally causing a vulnerable adult to be neglected. "Neglect" is defined in Neb. Rev. Stat. § 28-361.01 (Reissue 2016), which provides:

Neglect means any knowing or intentional act or omission on the part of a caregiver to provide essential services or the failure of a vulnerable adult, due to physical or mental impairments, to perform self-care or obtain essential services to such an extent that there is actual physical injury to a vulnerable adult or imminent danger of the vulnerable adult suffering physical injury or death.

The term "caregiver" is separately defined in Neb. Rev. Stat. § 28-353 (Reissue 2016), which provides: "Caregiver shall mean any person or entity which has assumed the responsibility for the care of a vulnerable adult voluntarily, by express or implied contract, or by order of a court of competent jurisdiction."

[4-7] Boyd argues that in order to be convicted of neglect of a vulnerable adult, she must be a caregiver to Pistillo, and she argues that the above-stated definition of caregiver requires that such person or entity must assume that role by either express or implied contract or by order of a court of competent jurisdiction. Stated differently, Boyd argues there

is no third category of a caregiver, that being one who voluntarily assumes the role of caregiver without a contract or court order. In furtherance of that interpretation, Boyd argues that the placement of the word "voluntarily" in § 28-353 suggests an intent by the Legislature to modify the terms "express or implied contract" and "order of a court of competent jurisdiction," and not to create a third category of caregiver—one who voluntarily agrees to serve in that role without an agreement and without a court order. We disagree with the proposed interpretation.

> [W]hen analyzing the text of a criminal statute, we follow settled principles of statutory construction. Penal statutes are considered in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served. Effect must be given, if possible, to all parts of a penal statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided. And in the absence of anything indicating otherwise, statutory language is to be given its plain and ordinary meaning.

*State v. Ferrin*, 305 Neb. 762, 772, 942 N.W.2d 404, 412 (2020).

In crafting the language of § 28-353, the Legislature stated that a "[c]aregiver shall mean any person or entity which has assumed the responsibility for the care of a vulnerable adult voluntarily, by express or implied contract, or by order of a court of competent jurisdiction." By stating that a "caregiver" is a person or entity who assumes responsibility for the care of a vulnerable adult, followed by providing an exclusive list of methods that, in the alternative, establish the assumption of that responsibility, all of which methods are separated by commas, the Legislature utilized a customary form of statutory construction.

[8,9] The Nebraska Supreme Court has referred to the construction, when crafted in this manner, as "[t]he legal principle of expressio unius est exclusio alterius." *Jacobson v. Shresta*, 288 Neb. 615, 623, 849 N.W.2d 515, 521 (2014). "The legal

principle of expressio unius est exclusio alterius (the expression of one thing is the exclusion of the others) recognizes the general principle of statutory construction that an expressed object of a statute's operation excludes the statute's operation on all other objects unmentioned by the statute." *Id*. Thus, when the language is styled in this manner, it appears as an expression by the Legislature that assuming the responsibility of care can be accomplished in three exclusive ways—voluntarily, by express or implied contract, or by court order. Further, interpreting the word "voluntarily" in § 28-353 as an expression of a separate form of assumption of responsibility, rather than a word modifying the phrases "by express or implied contract" or "by order of a court of competent jurisdiction," provides a more reasonable interpretation of that sentence. If we were to read the word "voluntarily" as modifying the phrase "by express or implied contract," we would be suggesting that a voluntary contract is different than an ordinary express or implied contract. *Id.* To the contrary, in *Moglia v. McNeil Co.*, 270 Neb. 241, 251, 700 N.W.2d 608, 618 (2005), the Nebraska Supreme Court cited William L. Prosser, Handbook of the Law of Torts § 92 (4th ed. 1971), for the following proposition: "'Contract actions are created to protect the interest in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific individuals named in the contract.'" As such, a contract, by definition, already incorporates the notion of voluntary consent to a promise and to suggest we read the word "voluntarily" as modifying the phrase "by express of implied contract" would render that term unnecessary or superfluous to § 28-353. As we previously stated, "Effect must be given, if possible, to all parts of a penal statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided." *State v. Ferrin*, 305 Neb. at 772, 942 N.W.2d at 412.

Accordingly, contrary to Boyd's argument, § 28-353 does not limit family caregiver status to an order of court or

express or implied contract. The statute also includes reference to any person who has assumed responsibility for the care of a vulnerable adult voluntarily. Here, the record indicates that Boyd moved into Pistillo's house to help care for her and to give her sister a break, because her sister was the person who normally took care of Pistillo. The record then indicated certain acts of care by Boyd in connection with Pistillo prior to her eventually calling for medical assistance for Pistillo. Again, an appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). In making this determination, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *Id*. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

Here, there was sufficient evidence to support that Boyd voluntarily assumed responsibility for the care of her mother, a vulnerable adult. As such, that portion of Boyd's assignment of error, that there was insufficient evidence in the record to satisfy that Boyd was a caregiver, fails.

### (c) Act by Boyd

Boyd finally argues that in order to be guilty of the crime of knowing and intentional neglect of a vulnerable adult, she must have committed a knowing and intentional act which caused or permitted the vulnerable adult to be neglected. Here, she argues that the record is devoid of any such act and that the district court erred in finding she committed one. In support of this contention, Boyd argues:

> The Nebraska Criminal Code defines "act" as "a bodily movement, [including] words and possession of property."

*Neb. Rev. Stat. § 28-109(1)* (Reissue 2016). By using the term "act" as opposed to "conduct" or "failure to act," the [L]egislature intended to limit criminal liability under this count for only those defendants who commit a knowing and intentional "bodily movement." This is consistent with legislative intent to respect the civil rights of the elderly adult, as discussed above.

Brief for appellee on cross-appeal at 16-17 (emphasis in original).

Alternatively, Boyd argues that § 28-386 is ambiguous in stating: "Further, to the extent that 'act,' as stated in the statute under which [Boyd] was charged, conflicts with the concept of neglect (which is an act or omission), the specific subsection [Boyd] is alleged to have violated, an ambiguity is created which requires resolution in [Boyd's] favor." Brief for appellee on cross-appeal at 17.

Section 28-386(1), as charged by the State, requires a "knowing and intentional abuse, neglect, or exploitation of a vulnerable adult or senior adult if he or she through a knowing and intentional act causes or permits a vulnerable adult or senior adult to be: . . . (f) [n]eglected." And as we previously stated, § 28-361.01 provides:

Neglect means any knowing or intentional act or omission on the part of a caregiver to provide essential services or the failure of a vulnerable adult, due to physical or mental impairments, to perform self-care or obtain essential services to such an extent that there is actual physical injury to a vulnerable adult or imminent danger of the vulnerable adult suffering physical injury or death.

Boyd attempts to argue that this statutory construction creates an ambiguity, because § 28-386 requires a physical act or words, while neglect can include an action or omission, and that this conflict in definition requires that we resolve this matter in favor of Boyd.

[10] Contrary to Boyd's assertions, the statutory language of Neb. Rev. Stat. § 28-109 (Reissue 2016) provides, in pertinent part: "For purposes of the Nebraska Criminal Code, unless the

context otherwise requires: (1) Act shall mean a bodily movement, and includes words and possession of property." The Nebraska Supreme Court recently had occasion to review the meaning of the phrase "unless the context otherwise requires" in *Heiden v. Norris*, 300 Neb. 171, 912 N.W.2d 758 (2018). Although the court was specifically reviewing the phrase in connection with Neb. Rev. Stat. § 43-1801 (Reissue 2016), the court's explanation of the phrase has parallel application here. In *Heiden*, the Nebraska Supreme Court held:

A review of our case law suggests that the "context" referred to in § 43-1801 is not the factual circumstances presented by a case, but the context of the statutory language itself. In *Pig Pro Nonstock Co-op v. Moore*, [253 Neb. 72, 568 N.W.2d 217 (1997),] we examined, but ultimately rejected, cases from other jurisdictions that went beyond the context of the statute to the facts in order to determine whether a cooperative was designated "non-profit" for purposes of a statutory scheme. As another court has since explained: "The term 'context' in the statutory phrase 'unless the context otherwise requires' means the context 'within which [a defined statutory term] is used within the statute's substantive provisions.'"

300 Neb. at 177, 912 N.W.2d at 763.

[11] Applying that construction here, § 28-386, as charged by the State, required a knowing and intentional act which caused or permitted a vulnerable adult to be neglected. Neglect is then defined as an act or omission on the part of the caregiver. Whereas the term "act" is generally defined in relation to the entire criminal code and generally relates to a physical act, its meaning is modified by the phrase "unless the context otherwise requires." Here, the more specific statute governing the term "neglect" in relation to an act expands the meaning of act to include an act or omission. It is a general principle of statutory construction that to the extent there is a conflict between two statutes, the specific statute controls over the

general statute. *State v. Kennedy*, 299 Neb. 362, 908 N.W.2d 69 (2018).

Here, by allowing Pistillo to remain in her condition without seeking assistance for the protracted period of time as demonstrated by this record, there was sufficient evidence to support the court's finding of a knowing and intentional omission on the part of Boyd, the caregiver, to provide essential services to Pistillo, a vulnerable adult. Accordingly, Boyd's claim that the record does not contain sufficient evidence to support a knowing and intentional "act" by her fails.

## 2. STATE'S APPEAL

Having determined that Boyd's claim of insufficiency of the evidence to support her conviction fails, we now address the State's claim that the district court abused its discretion in imposing an excessively lenient sentence.

[12-14] As the Nebraska Supreme Court recently stated in *State v. Gibson*, 302 Neb. 833, 839-40, 925 N.W.2d 678, 683-84 (2019):

> When the State appeals from a sentence, contending that it is excessively lenient, [an appellate] court reviews the record for an abuse of discretion, and a grant of probation will not be disturbed unless there has been an abuse of discretion by the sentencing court. There is not a different standard of review for sentences when the State appeals a sentence as excessively lenient or when a defendant appeals a sentence as excessive; an appellate court reviews for an abuse of discretion in either case. Whether an appellate court is reviewing a sentence for its leniency or its excessiveness, a sentence imposed by a district court that is within the statutorily prescribed limits will not be disturbed on appeal unless there appears to be an abuse of the trial court's discretion. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

In reviewing whether a sentencing court abused its discretion in imposing a sentence that was excessively lenient, we are guided by the factors set forth by Neb. Rev. Stat. § 29-2322 (Reissue 2016), as well as by the statutory guidelines set out for the direction of the sentencing judge in imposing or withholding imprisonment.

Section 29-2322 provides that in determining whether the sentence imposed is excessively lenient, an appellate court shall have regard for:

"(1) The nature and circumstances of the offense;

"(2) The history and characteristics of the defendant;

"(3) The need for the sentence imposed:

"(a) To afford adequate deterrence to criminal conduct;

"(b) To protect the public from further crimes of the defendant;

"(c) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and

"(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

"(4) Any other matters appearing in the record which the appellate court deems pertinent."

[15-19] Boyd was convicted of a Class IIIA felony, which is punishable by 0 to 3 years' imprisonment followed by 9 to 18 months' postrelease supervision if imprisonment is imposed and/or a $10,000 fine. See, Neb. Rev. Stat. § 28-105 (Reissue 2016); § 28-386. Class IIIA felonies have no mandatory minimum. See § 28-105. As noted by the court in *Gibson*:

Section 29-2260(2) allowed the district court to impose a period of probation in lieu of incarceration upon its assessment of certain criteria set forth therein. Section 29-2260 provides in part:

"(2) Whenever a court considers sentence for an offender convicted of either a misdemeanor or a felony for which mandatory or mandatory minimum imprisonment is not specifically required, the court may withhold

sentence of imprisonment unless, having regard to the nature and circumstances of the crime and the history, character, and condition of the offender, the court finds that imprisonment of the offender is necessary for protection of the public because:

"(a) The risk is substantial that during the period of probation the offender will engage in additional criminal conduct;

"(b) The offender is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility; or

"(c) A lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for law.

"(3) The following grounds, while not controlling the discretion of the court, shall be accorded weight in favor of withholding sentence of imprisonment:

"(a) The crime neither caused nor threatened serious harm;

"(b) The offender did not contemplate that his or her crime would cause or threaten serious harm;

"(c) The offender acted under strong provocation;

"(d) Substantial grounds were present tending to excuse or justify the crime, though failing to establish a defense;

"(e) The victim of the crime induced or facilitated commission of the crime;

"(f) The offender has compensated or will compensate the victim of his or her crime for the damage or injury the victim sustained;

"(g) The offender has no history of prior delinquency or criminal activity and has led a law-abiding life for a substantial period of time before the commission of the crime;

"(h) The crime was the result of circumstances unlikely to recur;

"(i) The character and attitudes of the offender indicate that he or she is unlikely to commit another crime;

"(j) The offender is likely to respond affirmatively to probationary treatment; and

"(k) Imprisonment of the offender would entail excessive hardship to his or her dependents.

"(4) When an offender who has been convicted of a crime is not sentenced to imprisonment, the court may sentence him or her to probation."

302 Neb. at 841-42, 925 N.W.2d at 684-85. The Supreme Court further stated:

While certain guidelines are set forth by statute, neither the trial court's sentencing determination nor our review of that determination for an abuse of discretion is formulaic or simply a matter of doctrine. The sentencing court is not limited in its discretion to any mathematically applied set of factors. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. Evidence regarding a defendant's life, character, and previous conduct, as well as prior convictions, is highly relevant to the determination of a proper sentence.

It is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate. The standard is not what sentence we would have imposed. If it were, we might reach a different result.

*State v. Gibson*, 302 Neb. 833, 843, 925 N.W.2d 678, 685 (2019).

Here, at the time that the presentence investigation report was prepared, Boyd was 64 years old, widowed, and retired. Boyd does not have any criminal convictions, and the level of service/case management inventory assessed her as a low risk to reoffend. She had recently sold her home on the east coast and was relocating to the west coast, when she stopped in Omaha to visit her sister and mother. Boyd had been staying

in her mother's home for approximately 1 month. The week prior to Boyd's calling 911 to assist her mother, her mother had fallen and remained in that position. Boyd provided her mother with juice and adult "Depends" undergarments. Further, according to Boyd, her mother had instructed her not to call her doctor or 911.

Although the facts in this case are very concerning, Boyd has no criminal history and has led a law-abiding life prior to the commission of this instant offense; the offense was the result of circumstances unlikely to recur; Boyd's character and attitudes indicate that she is unlikely to commit another crime; and she is likely to respond affirmatively to probationary treatment. Further, imprisonment in this case is not necessary to afford adequate deterrence to criminal conduct or to protect the public from further crimes by Boyd. As the Nebraska Supreme Court aptly stated in *Gibson*:

> The sentence imposed by the district court was lenient, but we cannot conclude that the court abused its discretion by issuing a sentence that was excessively lenient. In light of all the relevant sentencing considerations, the sentence was not untenable, unreasonable, or clearly against justice or conscience, reason, and evidence.

302 Neb. at 846, 925 N.W.2d at 687.

## VI. CONCLUSION

In sum, we reject both Boyd's claim that the evidence was insufficient to support her conviction and the State's claim that the sentence imposed was excessively lenient. Accordingly, we affirm Boyd's conviction and sentence.

Affirmed.